# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## IN KANSAS CITY, MISSOURI

| | | |
|---|---|---|
| **URIAH D. ROBERTS,** | ) | |
| | ) | |
| **Plaintiff.** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:04-CV-751-GAF** |
| | ) | |
| **CARDINAL HEALTH,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Presently before the Court is a Motion for Summary Judgment filed by the Defendant, Cardinal Health ("Cardinal"). (Doc. # 18). The Plaintiff, Uriah D. Roberts ("Roberts"), a black Liberian male, filed this action asserting that Cardinal violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), by subjecting him to various forms of race, color, national origin, and gender discrimination. (Doc. #1). Roberts further claims that he was wrongfully discharged in violation of Missouri law. Id. Roberts opposes this Motion arguing that genuine issues of material fact exist which preclude summary judgment as he disputes engaging in any of the conduct that led to his termination. (Doc. # 25). Upon careful consideration of the facts and arguments presented by the parties, Cardinal's Motion for Summary Judgment is GRANTED.

## DISCUSSION

### I.       Standard

Cardinal filed this Motion for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. According to this Rule, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering this Motion, the Court views all facts in the light most favorable to Roberts and gives him the benefit of all reasonable inferences. *See* Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997). The Court will not weigh the credibility of the evidence, but rather will focus on whether a genuine issue of material fact exists for trial. Roberts v. Browning, 610 F.2d 528, 531 (8th Cir. 1979); United States v. Porter, 581 F.2d 698, 703 (8th Cir. 1978).

An issue of material fact is "genuine" if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). When the evidence supports conflicting conclusions, a *genuine* issue of material fact exists and summary judgment should be denied. Kells v. Sinclair Buick—GMC Truck, Inc., 210 F.3d 827 (8th Cir. 2000) (emphasis added). The "materiality" of a disputed fact is determined by the substantive law governing the claim. Anderson, 477 U.S. at 248. "Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998) *citing* Anderson, 477 U.S. at 248.

Cardinal bears the burden of proving the absence of disputed material facts. *See* Prudential Ins. Co., 121 F.3d at 366. The burden then shifts to Roberts to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If Roberts fails to establish a factual dispute on an essential element of one of his claims, the Court will proceed to determine whether Cardinal is entitled to judgment as a matter of law on that claim. *See* E.E.O.C. v. Woodbridge Corp., 263 F.3d 812, 814 (8th Cir. 2001). To survive summary judgment, Roberts must make a sufficient showing concerning every essential element

2

of his case on which he bears the burden of proof. Osborn v. E.F. Hutton & Co., Inc., 853 F.2d 616, 618 (8th Cir. 1988).

The summary judgment rule is intended "to isolate and dispose of factually unsupported claims" and should be applied to accomplish this purpose. Prudential Ins. Co., 121 F.3d at 366. In the interest of promoting judicial economy, summary judgment should be granted to prevent the trial of cases lacking a genuine issue of material fact. Inland Oil and Transp. Co. v. U.S., 600 F.2d 725, 728 (8th Cir. 1979).

## II.     Background

Cardinal is a major provider of wholesale pharmaceuticals to hospitals and independent retail and chain pharmacy stores. (Doc. #19, ¶ 1). Roberts was hired by Cardinal in December 2000 as a warehouse worker at Cardinal's distribution facility in Kansas City, Missouri. (Doc. #19, ¶ 6). As a warehouse worker, Roberts was responsible for picking, packing and shipping products to Cardinal's customers in the Mid-America region. (Doc. #19, ¶ 2).

Roberts' employment  was terminated following Cardinal's investigation into an employee's complaint that she was offended by Roberts' inappropriate statements and conduct. (Doc. #19). Roberts vehemently and consistently denies the allegations giving rise to the investigation and the facts which were uncovered throughout the course of the investigation. (Doc. #25). Consequently, Roberts filed this action asserting a Title VII disparate treatment claim based on race, national origin and gender and a claim for wrongful discharge arising under Missouri law. Id. The Court will analyze each claim separately to determine the existence of any genuine issues of material fact and whether Cardinal is entitled to judgment as a matter of law.

## III.    Disparate Treatment: Race, National Origin and Gender Discrimination

3

## A. Facts

The crux of Roberts' disparate treatment claim is that he was terminated for engaging in an allegedly offensive conversation with a Caucasian-American female employee who was not cited or terminated for the same conduct. (Doc. #25). Roberts also asserts that the race, color and national origin discrimination he suffered consisted of "unfounded complaints" and "the denial of a promotion because of his alleged inability to clearly speak English." (Doc. #1).

While employed by Cardinal, Roberts was disciplined for violating the company's policy against "Harassment and Intimidation."[1] (Doc. #19, ¶¶ 6-22). Cardinal's Harassment and Intimidation policy is set forth in the employee handbook as follows:

> Cardinal Health will not tolerate harassment or intimidation of its employees by co-workers, supervisors, managers, customers, suppliers, or vendors. The Company forbids all conduct that harasses, disrupts or interferes with an employee's work performance or which creates an intimidating, offensive or hostile work environment. All employees are responsible for creating and maintaining a workplace environment that is free of harassment and intimidation. [ . . . ] Employees who engage in any form of harassment or intimidation are subject to disciplinary action, up to and including termination of employment.

On or around January 3, 2002, Roberts received a corrective action warning for acting inappropriately toward other employees. (Doc. #19, ¶ 14). Roberts' behavior was categorized as "horseplay," in violation of Cardinal's safety rules. Id. In the corrective action warning, Roberts was advised not to touch or otherwise treat employees in a harmful or threatening manner, and was warned that further instances of such behavior would lead to further disciplinary action up to and including termination. (Doc. #19, ¶ 15).

---

[1]Roberts does not dispute the disciplinary actions initiated by Cardinal.

4

Roberts signed the January 3, 2002 corrective action warning. (Doc. #19, ¶ 16). Roberts denies engaging in behavior which would be considered "horseplay" under Cardinal's safety rules. (Roberts Aff. ¶ 42).

On or around January 6, 2002, Roberts received a final corrective action warning for operating the stock picker in a careless and unsafe manner and almost crashing into other employees. (Doc. #19, ¶ 17). In the final corrective action warning, Roberts was advised that further instances of such "horseplay" and other harmful or threatening behavior would lead to further disciplinary action up to and including termination. (Doc. #19, ¶ 18). Roberts signed the January 6, 2002 corrective action warning. (Doc. #19, ¶ 19). Roberts denies acting in a careless manner on the stock picker and causing it to nearly crash into other employees. (Roberts Aff. ¶ 8).

On or around January 16, 2002, Roberts was given another final corrective action, this time for touching female employees inappropriately and talking to them in a sexual and inappropriate manner. (Doc. #19, ¶ 20). This final corrective action warning states the Lindy O'Rourke, Cardinal's Human Resources Specialist, conducted an investigation into a complaint she received regarding Roberts' behavior with female co-workers. (Doc. #19, Ex. A, Attach. 5). In the course of the investigation, Roberts' co-workers claimed that he touched them in a way that made them uncomfortable and would also call them "baby," refer to them as "my women" and tell them "you're my girlfriend." Id. Cardinal warned Roberts that this final corrective action warning was "the last straw" and further stated:

> Any future incidents of inappropriate behavior, in any respect, and [Roberts'] employment will be terminated. This includes, but is not limited to touching other employees, at all, speaking to a co-worker in a manner which it makes them feel uncomfortable, making any gestures that would make a co-worker feel uncomfortable, etc. Simply put, [Roberts] is to be a model employee with absolutely zero negative behavioral incidents.

Id. Cardinal presented the Court with a copy of the signed corrective action form, however, in his deposition Roberts stated that he had never seen the corrective action form before and denied all of the allegations contained therein. (Roberts Dep. 40:15-41:25).

In early August 2003, Cardinal management received a complaint from employee Michelle Caraballo ("Caraballo") who stated that she was offended by Roberts' inappropriate statements and conduct. (Doc. #19, ¶ 35). Cardinal asserts that Caraballo's complaint pertained solely to the inappropriate comments and conduct of Roberts. (Doc. #19, ¶ 36). Caraballo allegedly complained about the following conduct:

- Caraballo overheard Roberts talking to a white female employee, Lorie Zuba ("Zuba") about "retiring from pimping and hoeing[2]." (Doc. #19, ¶ 37).

- Roberts made a statement to Caraballo about "hoing [her] for $250" and that she should "bring [Roberts] the money." (Doc. #19, ¶ 38).

- Caraballo reported that Roberts had placed his hands on her shoulders during the week of July 27, 2003. She removed Roberts' hands from her shoulders and told him to stop touching her to which Roberts responded that he could do that if he wanted to. (Doc. #19, ¶ 39).

---

[2]Cardinal quotes Roberts as discussing "hoeing" with his female co-workers. A person is "hoeing" when he or she uses a garden tool with a thin, flat blade on a long handle to weed or cultivate land. *See* Webster's Third New International Dictionary (Unabridged), 1076 (1993) (definition of "hoe"). Obviously, there is nothing overtly sexual or racially offensive about "hoeing." The Court, following the lead of the Seventh Circuit, has taken the liberty of changing "hoeing" to "hoing." *See* U.S. v. Murphy, 406 F.3d 857, 859 FN 1 (7th Cir. 2005) (Seventh Circuit interprets "hoe" as "ho" and observes that "ho [is] a staple of rap music vernacular as, for example, when Ludacris raps 'You doin' ho activities with ho tendencies.'"). The Court's research has revealed that "hoing" is an alteration of "whoring" meaning "to have unlawful sexual intercourse as or with a whore." *See* Webster's Third New International Dictionary (Unabridged), 2612 (1993) (definition of "whoring").

6

Roberts denies all of the conduct which formed the basis of Caraballo's complaint. With respect to the comments Caraballo overheard him making to Zuba, Roberts explains that on August 6, 2003 he was in the break room talking to Zuba. (Roberts Dep. 121:21-125:8). Roberts states that when he entered the break room, Zuba said to him, "How you doing, [big or pimp] daddy?" Id. To which Roberts responded, "I'm fine." Id. Zuba continued the conversation stating, "You been pimping?" and "[y]ou a pimp daddy." Id. Roberts responded, "I'll be pimping if I be 80 to 90 years old. I be walking with my cane." Id. Roberts denies telling Caraballo that he was going to "ho" her out for $250. (Roberts Dep. 125:9-22, Aff. ¶ 5). Finally, Roberts denies touching Caraballo or any other female employee inappropriately. (Roberts Dep. 118:21-20, Aff. ¶¶ 6-8).

Cardinal conducted a prompt investigation into Caraballo's complaint, during which time Roberts was suspended from work with pay. (Doc. #19, ¶ 40). During the investigation, Cardinal spoke with three of Roberts' co-workers: Niki Barton ("Barton"), Zuba, and Adolfo Villegas ("Villegas"). Roberts denies the factual allegations unearthed in the investigation and asserts that Barton, Zuba and Villegas made these "unfounded complaints" because Roberts is a black Liberian male.

Barton told Cardinal that she overheard Roberts talking about "pimping out and hoing out," how much he could "sell" Caraballo for, and how Caraballo could "fix him dinner and be his sugar mama." (Doc. #19, ¶ 41). Roberts denies these allegations. (Roberts Dep. 131:24-132:9, Aff. ¶ 5). Barton also stated that she overheard Roberts making the following comments to Caraballo: "I could rock your world"; "you don't know what you're missing"; "you into black guys[?];" and "you will come around in time." (Doc. #19, ¶ 42). Roberts denies these allegations. (Roberts Dep. 125:9-22, 131:13-17, 131:8-23, Aff. ¶ 4). Barton reported that she had witnessed Roberts "get in [Caraballo's] face and touch around her

7

shoulders." (Doc. #19, ¶ 43). Roberts denies touching Caraballo and asserts that he never touched any female employee inappropriately. (Roberts Dep. 118:21-121:20, Aff. ¶ 6).

Zuba reported that Roberts asked her if she wanted to have his baby and stated that he would give her $20, but would not pay child support. (Doc. #19, ¶ 44). Roberts denies making this statement. (Roberts Dep. 133:22-134:8). Zuba further stated that she overheard Roberts tell Caraballo that she was looking good and if Caraballo would go out with him, she would not want to go out with anyone else, and that he "makes ladies happy." (Doc. #19, ¶ 45, 46). Roberts also denies this statement. (Roberts Dep. 134:9-25). Finally, Zuba asserted that she overheard Roberts tell another employee or employees that he could "rock their world" and that they did not know what they were missing. (Doc. #19, ¶ 47). Robert denies this allegation. (Roberts Dep. 131:3-12).

Finally, Villegas reported to Cardinal that he "kept telling [Roberts] to leave everyone alone" and that Roberts "don't [sic] have any business in their lives." (Doc. #19, ¶ 48). Villegas further reported to Cardinal that Roberts joked with female Cardinal employees in an insulting matter and one time "tr[ied] to get business in [Villegas'] wife." Id. Roberts also denies making these statements and engaging in the alleged conduct. (Roberts Dep. 132:10-133:1, 133:2-13, Aff. ¶ 14).

Cardinal's investigation into Caraballo's complaint substantiated that Roberts had made inappropriate comments and engaged in inappropriate behavior that was considered offensive to other employees, in violation of Cardinal's harassment and intimidation policy. (Doc. #19, ¶ 50). As detailed above, Roberts had a history of inappropriate comments and conduct at work, for which he had been disciplined. (Doc. #19, ¶ 52). Accordingly, Cardinal concluded that Roberts had violated its policy against harassment and intimidation for the second time. (Doc. #19, ¶ 54). On August 13, 2003, various members

8

of Cardinal management met with Roberts to discuss his most recent violation of Cardinal's harassment and intimidation policy. (Doc. #19, ¶ 55). At the end of this meeting, Roberts' employment with Cardinal was terminated. (Doc. #19, ¶ 58). Roberts challenges the propriety of Cardinal's investigation and denies making any inappropriate comments or engaging in any inappropriate behavior. (Doc. #25, ¶¶ 24, 26, 28, 29, 32).

Roberts claims that he was fired because of the conversation Caraballo overheard in the break room between himself and Zuba. As he was fired and Zuba was not, Roberts claims he was actually terminated because he was a black Liberian male, not because he violated Cardinal's harassment and intimidation policy. Cardinal asserts that it never received a complaint about Zuba's conduct. (Doc. #19, ¶ 49). Cardinal claims that its investigation into Caraballo's complaint did not uncover any inappropriate comments or conduct by Zuba. (Doc. #19, ¶ 51). At the time of Caraballo's complaint, Zuba did not have a history of inappropriate comments and conduct at work, and she had never been disciplined for the same. (Doc. #19, ¶ 53). Roberts claims that had Cardinal conducted a "proper" investigation, it would have discovered that Zuba, not Roberts, initiated the conversation and used the words "pimping" and "pimp daddy." (Doc. #25, ¶¶ 23, 25, 27).

Roberts further asserts that he suffered race and national origin discrimination because he was denied a promotion because of his inability to clearly speak English. (Doc. #1). Roberts claims that he applied for a promotion to a team leader position in 2001, but an individual by the name of "Mark" told him he would not receive the position "because of his accent." (Roberts Dep. 74:20-76:7, Nkomo Aff. ¶ 4). Cardinal claims that no individual by the name of "Mark" was a decision-maker with respect to any team leader position decisions in 2001. (Doc. #19, ¶ 11). Cardinal further asserts that Roberts' race,

9

color, national origin and accent were not factors in Cardinal's decision not to promote Roberts to the team leader position in 2001. (Doc. #19, ¶ 13).

On November 14, 2003, Roberts filed a sworn Charge of Discrimination ("Charge") with the Missouri Commission on Human Rights ("MCHR") and the Equal Employment Opportunity Commission ("EEOC"). (Doc. #19, ¶ 59). In the Charge, Roberts asserted that he was discharged because of his race (black), sex (male) and national origin (Liberian) by Cardinal because he engaged in a sexually inappropriate conversation with a Caucasian-American female co-worker who was not similarly terminated for her participation in the conversation. (Doc. #19, Ex. C). Roberts describes this conversation as follows:

1.  At work I am on friendly terms with a white female named Zubah Loury. At times we kid each other, but there has never been any offense taken by either party. On the day in question, I walked into the break room. Ms. Loury and I at first glance appeared to be the only ones there. We then engaged in a casual conversation.
2.  Ms. Loury said to me (in a jovial manner), "Pimp daddy, what's up? I know you will be pimping when you are eighty or ninety years old."
3.  I replied in a similar vein, "I will be pimping with no teeth in my mouth, and I will be walking with my king, too." That was the extent of our conversation, which was friendly, private and unintended for anyone else's ears.
4.  Shortly after that I noticed that there had been one other person, sitting quietly in the break room. He turned out to be a manager. At that time he said nothing.

Id. Aside from Roberts' termination, the Charge did not mention any other adverse employment actions he had suffered or any other conduct by Cardinal that Roberts believed violated Title VII.

### B. **Legal Standard**

A plaintiff in a Title VII discrimination case can survive summary judgment in one of two ways. Russell v. Kansas City, Missouri, 414 F.3d 863, 866-67 (8th Cir. 2005). First, the plaintiff can produce direct evidence of discrimination, that is, "evidence showing a specific link between the alleged

Case 4:04-cv-00751-GAF   Document 53   Filed 03/20/06   Page 10 of 24

discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." Russell, 414 F.3d at 866 *quoting* Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). Here, Roberts does not contend that there is direct evidence of discrimination on the record.

In the absence of direct evidence of intentional discrimination, "a plaintiff may survive an employer's motion for summary judgment by 'creating the requisite inference of unlawful discrimination' through the familiar three-step burden-shifting analysis originating in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Russell, 414 F.3d at 866-867. In the first stage of the McDonnell Douglas analysis, Roberts bears the burden of establishing a prima facie case of discrimination. *See* McDonnell Douglas, 411 U.S. at 802. If Roberts presents facts sufficient to support a prima facie case, then the burden shifts to Cardinal to rebut the prima facie case by articulating a legitimate, non-discriminatory reason for its decision to terminate Roberts' employment. *See* Id. If Cardinal satisfies this burden, Roberts must show that Cardinal's explanation for its decision was merely pretextual. *See* Hossani v. Western Missouri Medical Center, 97 F.3d 1085, 1088 (8th Cir. 1996). To establish a prima facie case of unlawful discrimination, Roberts must demonstrate that (1) he is a member of a protected group; (2) he was meeting Cardinal's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated differently from other similarly situated non-minority employees. *See* Wheeler v. Aventis Pharmaceuticals, 360 F.2d 853, 857 (8th Cir. 2004) *citing* Williams v. Ford Motor Co., 14 F.3d 1305, 1308 (8th Cir. 1994).

   1.    *Termination*

Roberts claims that he was terminated for engaging in a "playful" conversation with Zuba, a Caucasian-American female, who was not terminated for her participation in the conversation. Assuming

11

that Roberts could establish a prima facie case of unlawful discrimination based on his termination, this Court finds that Roberts has failed to present sufficient evidence of pretext to survive summary judgment.

Upon proof of a prima facie case of discrimination under the McDonnell-Douglas framework, the burden of proof shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's termination. "The burden to articulate a non-discriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." Rodgers v. U.S. Bank, 417 F.3d 845, 853 (8th Cir. 2005) *quoting* Floyd v. State of Missouri Dept. of Soc. Servs., Div. of Family Servs., 188 F.3d 932, 936 (8th Cir. 1999). Here, Cardinal alleges that it terminated Roberts for his accumulated violations of the company's policy prohibiting harassment and intimidation. Cardinal's policy prohibited "all conduct that harasses, disrupts or interferes with an employee's work performance or creates an intimidating, offensive or hostile work environment." Employees are warned that engaging in such conduct may result in the termination of their employment.

On January 3, 2002, Roberts received a corrective action warning for engaging in "horseplay" and was advised not to touch or otherwise treat employees in a harmful or threatening manner. On January 6, 2002, Roberts received a final corrective action warning for operating the stock picker in a careless and unsafe manner and was advised that further instances of such horseplay and other harmful or threatening behavior would lead to further disciplinary action up to and including termination. On January 16, 2002, Roberts was given a final corrective action warning for touching female employees inappropriately and talking to them in a sexual and inappropriate manner. Cardinal warned Roberts that this final corrective action warning was "the last straw" and further advised him that future incidents of inappropriate behavior such as touching other employees and speaking to or making a gesture that would make a co-worker feel

Case 4:04-cv-00751-GAF   Document 53   Filed 03/20/06   Page 12 of 24

uncomfortable, would result in the termination of his employment. In short, Roberts was told that he must "be a model employee with absolutely zero negative behavioral incidents." Although Roberts disputes the underlying facts of these violations, Roberts does not dispute that he received these reprimands and that he was threatened with termination if he engaged in further conduct which violated Cardinal's harassment and intimidation policy.

In early August 2003, Cardinal received another complaint regarding Roberts' conduct. Cardinal promptly initiated an investigation into Roberts' behavior which revealed additional conduct in violation of Cardinal's harassment and intimidation policy. Accordingly, pursuant to the prior warnings, Roberts' employment with Cardinal was terminated. The Court finds that Cardinal has articulated a legitimate, nondiscriminatory reason for terminating Roberts' employment as he was fired for violating the company's policy prohibiting harassment and intimidation.

Roberts claims that he can establish that Cardinal's proffered nondiscriminatory reason for terminating his employment was, in fact, pretext for discrimination. Roberts claims that he was terminated for engaging in a conversation with a Caucasian-American female, Zuba, who was not terminated for her participation in the conversation. Roberts asserts that this is disparate treatment which establishes pretext because he was treated less favorably than a similarly situated employee outside the relevant protected classes. Rodgers, 417 F.3d at 853 (The Eighth Circuit found that a plaintiff may prove disparate treatment by demonstrating that she was treated less favorably than similarly situated employees outside of her protected group.).

However, "at the pretext stage of the McDonnell Douglas burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." Rodgers, 417 F.3d

13

at 853. Roberts must show that he and Zuba "were similarly situated in all relevant respects." Id. *quoting* Wheeler v. Aventis Pharms., 360 F.3d 853, 858 (8th Cir. 2004). "To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of 'comparable seriousness.'" Id. *quoting* Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972-73 (8th Cir. 1994).

Roberts' argument that he was treated differently than another similarly-situated employee outside of his protected group fails because he has not proven that he and Zuba were similarly-situated in all relevant respects. Roberts does not dispute that at the time of Caraballo's complaint, Cardinal had never received a complaint that Zuba had made comments or engaged in conduct that was considered inappropriate or offensive. Furthermore, Cardinal's investigation into Caraballo's complaint did not reveal any inappropriate behavior by Zuba.[3] At the time of Roberts' termination, Cardinal had no knowledge of any inappropriate conduct by Zuba which Roberts' presently alleges. Accordingly, Roberts cannot prove that he and Zuba were similarly situated in all respects as the record reveals that Cardinal was unaware of any inappropriate conduct or comments by Zuba at the time of Roberts' termination.

Furthermore, Roberts and Zuba are not similarly situated in all relevant respects because Roberts has a history of violating Cardinal's policy prohibiting harassment and intimidation. Roberts has not established that Zuba had a similar history of violating Cardinal's policy prohibiting harassment and intimidation. In Forrest v. Kraft Foods, Inc, 285 F.3d 688, 691-92 (8th Cir. 2002), the Eighth Circuit found that differing disciplinary history precludes a conclusion that the plaintiff and his comparator are

_____

[3]Roberts challenges the sufficiency of Cardinal's investigation contending that had Cardinal conducted a "proper" investigation it would have uncovered Zuba's inappropriate comments and behavior. However, Roberts' conclusory testimony is unsupported by the record. Roberts offers no evidence in support of his position that Zuba engaged in any inappropriate behavior.

14

"similarly situated." In <u>Forrest</u>, the plaintiff contended that because he was treated differently than a Caucasian employee, his employer's reason for terminating him was pretextual. <u>Forrest</u>, 285 F.3d at 691-92. The plaintiff asserted that a Caucasian employee committed a similar infraction, leaving work during his shift without permission, but was punished only with a two-month suspension, whereas the plaintiff was fired. <u>Id</u>. The Eighth Circuit concluded that the plaintiff and his Caucasian co-worker were not "similarly situated" because the plaintiff failed to prove that the Caucasian employee had a comparable disciplinary history as the record revealed that the Caucasian employee's unauthorized departure was his first such offense. <u>Id</u>. In contrast, the plaintiff had "amassed an extensive disciplinary record" as he was cited for attendance problems, unacceptable behavior, poor workmanship, and leaving work early without permission. <u>Id</u>. at 690.

Similar to the plaintiff in <u>Forrest</u>, Roberts has also alleged that his employer's proffered reason for terminating him was pretextual because he was treated differently than a similarly-situated Caucasian-American female. Also like the plaintiff in <u>Forrest</u>, Roberts has failed to prove that he and Zuba had comparable disciplinary histories. Rather, the record reveals that Roberts had previously been cited on three separate occasions for endangering the safety of his co-workers by engaging in unnecessary horseplay, inappropriately touching his co-workers and making improper comments to his female co-workers. Pursuant to the Eighth Circuit's holding in <u>Forrest</u>, this Court finds that Roberts has failed to prove that he and Zuba were similarly situated, and as such, Roberts has failed to prove that Cardinal's proffered reason for terminating his employment was pretextual. Accordingly, Cardinal's Motion for Summary Judgment on Roberts' Title VII claim arising out of his termination for violating Cardinal's policy prohibiting harassment and intimidation is GRANTED.

15

## 2. *Unfounded Complaints*

Roberts asserts that Cardinal is liable under Title VII for the unfounded complaints Roberts' co-workers lodged against him accusing him of inappropriate workplace conduct. Cardinal contends that these allegedly unfounded complaints and accusations of inappropriate conduct do not constitute an adverse employment action. Although Roberts is clearly upset by these allegations, "not everything that makes an employee unhappy is an actionable adverse action."' Manning v. Metropolitan Life Ins. Co., Inc., 127 F.3d 686, 692 (8th Cir. 1997) *quoting* Montandon v. Farmland Indus., 116 F.3d 355, 359 (8th Cir. 1997). To constitute an actionable "adverse employment action," the particular action at issue must have created a "*material* employment disadvantage, such as a change in salary, benefits, or responsibilities." Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000) (emphasis in original). Arguably, these allegedly unfounded complaints gave rise to the investigation which led Cardinal to conclude that Roberts had violated its policy against harassment and intimidation thereby resulting in Roberts' termination. To the extent that these allegedly unfounded allegations led to Roberts' termination, they have been considered above. However, the complaints of Caraballo, Barton, Zuba and Villegas, standing alone, do not constitute an adverse employment action. Accordingly, Roberts has failed to prove that Cardinal is liable for a violation of Title VII arising solely out of Roberts' co-workers allegedly unfounded complaints. Accordingly, Cardinal's Motion for Summary Judgment on Roberts' Title VII claim arising out of the allegedly unfounded complaints of his co-workers is GRANTED.

## 3. *Failure to Promote*

Finally, Roberts contends that he was discriminated against on the basis of his race, gender and national origin because Cardinal failed to promote him to a team leader position in 2001. Cardinal argues

16

that Roberts failed to exhaust his administrative remedies with respect to this claim. As a prerequisite to maintaining a cause of action under Title VII, Roberts must file a timely administrative charge with the EEOC as required by 42 U.S.C. § 2000e-5(e)(1). Pursuant to 42 U.S.C. § 2000e-5(e)(1), Roberts must file a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred."[4] The Supreme Court requires "strict adherence to the procedural requirements specified by the legislature" in 42 U.S.C. § 2000e-5(e) in order to "guarantee evenhanded administration of the law." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108 (2002) *quoting* Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980). The Court has further noted that "[b]y choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." National R.R., 536 U.S. at 109 *quoting* Mohasco, 447 U.S. at 825.

Roberts filed his EEOC charge of discrimination on November 14, 2003. Pursuant to 42 U.S.C. § 2000e-5(e)(1), only conduct that occurs within 300 days of the EEOC filing is actionable. Accordingly, when a charge is filed on November 14, 2003, only conduct occurring on or after January 18, 2003 is actionable. Here, Roberts contends that Cardinal violated Title VII by failing to promote him sometime in 2001. Roberts' claim that Cardinal violated Title VII by failing to promote him sometime in 2001 is not actionable as it falls outside the 300-day statutory time period set forth in 42 U.S.C. § 2000e-5(e)(1). Accordingly, Cardinal's Motion for Summary Judgment on Roberts' Title VII claim arising out of Roberts' allegation that Cardinal failed to promote him to the team leader position sometime in 2001 is GRANTED.

---

[4]42 U.S.C. § 2000e-5(e)(1) requires claimants to file charges with the EEOC within either 180 or 300 days of the alleged unlawful employment practice. Claimants residing in Missouri have 300 days to file. *See* Owens v. Ramsey Corp., 656 F.2d 340, 342 (8th Cir. 1981).

Case 4:04-cv-00751-GAF   Document 53   Filed 03/20/06   Page 17 of 24

**IV.     Wrongful Discharge**

Cardinal claims that Roberts was an at-will employee. (Doc. #18). During his orientation, Roberts was given Cardinal's employee handbook, which he read and retained throughout his employment. (Doc. #19, ¶ 7). Cardinal contends that its "Employment at Will" policy was explained in the employee handbook as follows:

> <u>Employment at Will</u>  All Cardinal employees are employed at-will. This means that employees are free to resign their employment at any time, just as Cardinal is free to terminate their employment for any lawful reason, at any time, with or without cause or notice. All employees will remain at-will employees of Cardinal throughout the duration of their employment. An employee's at-will status can never be altered or changed in any way by an oral or collateral statement or agreement. An employee's at-will status cannot be changed except in writing signed by the President of Cardinal Health or the Vice President of Human Resources. Employees must not rely to their detriment upon this handbook, the company's policies and procedures, or upon other representations of the company because they are all subject to change.

(Doc. #19, ¶ 3).

Roberts claims that Cardinal assured him he would only be discharged "for just cause, pursuant to [Cardinal]'s policies and procedures." (Doc. #1). Roberts contends that he was "told that he could only be fired for points or other reasons." (Doc. #25, ¶ 3). In support of this contention, Roberts offers the following deposition testimony:

> Q:     When you were hired at Cardinal, did anybody tell you that you could only be fired for just cause? Did anybody ever tell you that?
> A:     No.
> Q:     Did anybody ever tell you that you could only be fired for certain reasons?
> A:     Yes.
> Q:     Who told you that, and what did they tell you?
> A:     Alana (ph) she's a human resources lady. Olana (ph) – Lor- -- what – Lin –
> Q:     Lindy?
> A:     Lindy. Yeah, she did all my paperwork. She the one that tell me you can get fired for point, sexual harassment.

18

| Q: | She told you that you could get fired for points or sexual harassment? |
|---|---|
| A: | Point, sexual harassment, like that. |
| Q: | Do you remember reading in the employment handbook the parts that talked about things that you could be fired for? |
| A: | Yes. |

(Roberts Dep. 163:12-164:8).  Cardinal contends that Roberts "was never assured by anyone at Cardinal 'that he would have job security and that it was [Cardinal]'s policy to discharge employees only for just cause.'" (Doc. #19, ¶ 8).[5]

Under Missouri law, "an employee is considered to be 'at-will' unless he is subject to a contract setting the duration of his employment or delineating the reasons for which he can be fired." Callantine v. Staff Builders, Inc., 271 F.3d 1124, 1130 (8th Cir. 2001).  An "at-will" employee can be terminated at any time for cause or without cause and the employee has no cause of action for wrongful discharge as a matter of law.  Paul v. Farmland Indus., Inc., 37 F.3d 1274, 1276 (8th Cir. 1994).  Here, Cardinal contends that Roberts was an at-will employee and, therefore, as a matter of law, Roberts has no cause of action for wrongful discharge.  Roberts contends that he was told he could only be terminated for "points" or for reasons delineated in the employee handbook.

However, Roberts does not argue that this disputed fact precludes summary judgment on his wrongful discharge claim.  Rather, Roberts admits that Cardinal's employee handbook states that his

---

[5]In support of this contention, Cardinal cites to pages 63, 64 and 163 of Roberts' deposition.  However, Roberts' did not testify in his deposition at pages 63, 64 and/or 163 that he "was never assured by anyone at Cardinal that he would have job security and that it was [Cardinal's] policy to discharge employees only for just cause."  (Doc. #19, ¶ 8).

19

employment was at-will[6] and proceeds to argue that his at-will employment was modified by the affirmative action clause included in the employee handbook. This affirmative action clause provides:

> Affirmative Action The company is committed to ensuring that no employee or applicant is discriminated against because of race, color, religion, sex, national origin, disability, or veteran status. Cardinal will take affirmative action to ensure equal employment opportunities for qualified individuals without regard to race, color, religion, sex, national origin, disability, or veteran status. Such action shall include, but not be limited to, sourcing, recruiting, hiring, transferring, upgrading and/or promoting, maintaining, or establishing conditions and privileges of employment, training, educational assistance, social and recreational programs, compensation and benefits, disciplining and laying off or terminating employment.

(Doc. #19, Ex. A). Roberts argues that based on the holding in Hamby v. City of Liberty, Missouri, 1999 WL 559625 (Mo. App. W.D.) *overruled on other grounds by* Hamby v. City of Liberty, Missouri, 20 S.W.3d 515 (Mo. 2000), he "had a limited protected interest in his job to the extent that he would not be terminated unfairly or in a discriminatory manner by Cardinal." (Doc. #25).

The Hamby case is inapposite here as the employment manual at issue in Hamby contained a detailed post-termination grievance process that altered the employee's at-will status. Hamby, 1999 WL 559625 at *5. The court found that this extensive administrative review of an employee's termination gave rise to the understanding that the employee's employment would not terminated unfairly or in a discriminatory way. Id. Here, Roberts does not contend that an elaborate post-termination grievance process outlined in Cardinal's employee handbook altered his at-will employment status. Rather, he argues that Cardinal's affirmative action policy required that his employment only be terminated for "just cause." Accordingly, Roberts' cited legal authority does not support his position. Therefore, this Court finds that

_____

[6]"Plaintiff agrees that Cardinal's employee manual states his employment was at will." (Doc. #25, p. 20).

Cardinal's affirmative action policy, as stated in its employee handbook, did not alter Roberts' at-will employment status.

Roberts contends that he relied upon Cardinal's "course of conduct . . . indicating that there was a point system and an evaluation process which would be followed before any employee would be terminated." (Doc. #25). Roberts fails to cite any evidence in the record in support of his position that Cardinal had a pattern and practice of modifying the employment at-will status of its employees by promising that they could only be terminated for "points" and/or "sexual harassment." Although Roberts testified at his deposition that he was told by Lindy O'Rourke, Cardinal's Human Resources Specialist, that he *could* be fired "for points or sexual harassment," there is insufficient evidence in the record to support the conclusion that he could *only* be fired for those reasons. Furthermore, this statement, standing alone, is insufficient to create a "contract" setting the duration of Roberts' employment or delineating the reasons for which he could be terminated because O'Rourke's statement is not sufficiently definite to be considered an "offer," there is no evidence of "acceptance," and no evidence of "bargained for consideration." *See* Johnson v. McDonnell Douglas Corp., 745 S.W.2d 661, 662 (Mo. 1988) (en banc) (internal citations omitted) (To state a claim for wrongful discharge under Missouri law, the plaintiff must plead and prove the essential elements of a valid contract: offer, acceptance and bargained for consideration.).

Additionally, Cardinal's at-will employment policy explicitly prohibits the type of modification which Roberts states altered his at-will employment status. Cardinal's employment manual states that "an employee's at-will status can never be altered or changed in any way by an oral or collateral statement or agreement." Furthermore, pursuant to Cardinal's at-will employment policy, only the President of Cardinal

21

Health or the Vice President of Human Resources is authorized to alter an employee's at-will employment status. As O'Rourke holds neither position, Cardinal's policy precludes her from altering Roberts' at-will employment status.

As Roberts has failed to present sufficient evidence that Cardinal altered the employment at-will policy articulated in its employee handbook by its subsequent conduct, this Court finds that Roberts was an at-will employee and, therefore, he has no cause of action for wrongful discharge as a matter of Missouri law. Accordingly, Cardinal's Motion for Summary Judgment on Robert's wrongful discharge claim is GRANTED.

## CONCLUSION

Roberts has failed to present sufficient evidence to support his claims of disparate treatment based on race, color, national origin and gender in violation of Title VII and wrongful discharge in violation of Missouri law. Cardinal terminated Roberts for his repeated violations of the company's harassment and intimidation policy following its investigation into complaints about Roberts' inappropriate behavior and comments. Roberts has failed to prove that Cardinal's proffered reason for terminating his employment was pretextual because the record does not support Roberts' contention that he and Zuba, who Roberts alleges engaged in the same conduct but was not fired, were similarly situated in all relevant respects. Roberts' claim that Cardinal failed to promote him in violation of Title VII is not actionable as Roberts failed to file a timely administrative complaint regarding the alleged discrete act of discrimination. Finally, Roberts has failed to present sufficient evidence of a contract between himself and Cardinal which modified his at-will employment status to recover on his wrongful discharge claim. Based on the foregoing, Cardinal's Motion for Summary Judgment is GRANTED.

23

**IT IS SO ORDERED.**

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
 United States District Court

DATED:    March 20, 2006

24